1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

United States of America,

          Plaintiff,

vs.

Hilda A. Hernandez & Elvia Callahan,

          Defendants.

CV 11-0250-TUC-DCB (JR)

**REPORT AND RECOMMENDATION**

      In this action, the United States seeks to recover unpaid employment taxes and requests judgment against Defendants Hilda Hernandez and Elvia Callahan for value received by them as a result of the fraudulent transfer of property to them from the tax debtor, Alfonso's Carnitas, Inc.  The United States has filed a Motion for Summary Judgment (Doc. 28).  In response, Defendants Hernandez and Callahan filed a Motion to Dismiss the Motion for Summary Judgment (Doc. 29) and a Motion Opposing I.R.S. Motion for Summary Judgment (Doc. 41), which the Court collectively construes as the Defendants' opposition to the United States' Motion for

1

Summary Judgment.  On December 6, 2012, the Court heard oral argument on the motion and now issues its recommendation that the United States' Motion for Summary Judgment be granted in part and denied in part.

**I.      Summary judgment standard**

A motion for summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a); *Addisu v. Fred Meyer, Inc*., 198 F.3d 1130, 1134 (9th Cir. 2000). The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324. The court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material. *Celotex*, 477 U.S. at 324. However, the assertion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp*., 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving party must come forward with admissible evidence to satisfy the burden. Fed.R.Civ.P. 56(c); *see also Hal Roach Studios, Inc. v. Feiner & Co., Inc*., 896 F.2d 1542, 1550 (9th Cir. 1990).

1    A genuine issue for trial exists if the non-moving party presents evidence from

2    which a reasonable jury, viewing the evidence in the light most favorable to that

3    party, could resolve the material issue in his or her favor. *Anderson v. Liberty Lobby,*

4    *Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505 (1986); *Barlow v. Ground*, 943 F.2d

5    1132, 1134–36 (9th Cir. 1991). Conversely, summary judgment must be granted

6    where a party "fails to make a showing sufficient to establish the existence of an

7    element essential to that party's case, on which that party will bear the burden of

8    proof at trial." *Celotex*, 477 U.S. at 322.

9    In the context of a motion for summary judgment where a litigant is

10   proceeding pro se, the court has an obligation to construe pro se documents liberally

11   and to afford the pro se litigant the benefit of any doubt. *Erickson v. Pardus*, 551

12   U.S. 89, 94 (2007) (per curiam); *Baker v. McNeil Island Corrections Ctr.*, 859 F.2d

13   124, 127 (9th Cir. 1988).

14   **II.    Facts**

15   The unpaid employment taxes that are at the heart of this case were incurred

16   by Alfonso's Carnitas, Inc. ("Alfonso's Inc.") from 2003 through 2007 and, with

17   interest and penalties, now total approximately $47,059.00. *Plaintiff's Separate*

18   *Statement of Facts* ("*PSOF*"), ¶¶ 10 & 13. Defendant Hernandez attempts to create

19   some confusion by questioning whether these taxes are properly attributed to

20   Alfonso's, Inc. However, her attempt is a red herring requiring some explanation.

21   The taxes in question are owed by an entity registered with the IRS as "Alfonsa's

22   Carnitas, Inc." (with an "a" instead of an "o"), with an assigned Employment

3

Identification Number of xx-xxx-8725.  Although there is also another Employment Identification Number (xx-xxx-9128) assigned to the accurately spelled Alfonso's Carnitas, Inc., Alfonso's, Inc. never used that EIN to file tax returns.  The debt in question is due under the 8725 EIN which was the EIN used by Alfonso's, Inc. even though it was assigned to the incorrectly spelled "Alfonsa's."  *PSOF*, ¶¶ 1-4. Additionally, Alfonso's Inc., through its president, Rogelio Hernandez, was fully aware of that the company was behind in its payment of employment taxes to the IRS and was aware of Federal Tax Liens filed against the corporation for unpaid employment taxes.  *PSOF*, ¶¶ 11-12.

The restaurant Alfonso's Carnitas, located at 2801 S. 6th Avenue (the "Alfonso's Property"), was founded by Alfonso Perez.  In 2003, one of Alfonso's Carnitas' cooks, Rogelio Hernandez, created the Alfonso's Inc. corporation with the intention of buying the restaurant from Perez.  The officers of Alfonso's Inc. included Rogelio Hernandez, who was president, along with his brother, Michael Hernandez, who was treasurer (but was imprisoned during the relevant time period), and their mother, Defendant Hilda Hernandez, who was the corporation's secretary. *PSOF*, ¶¶ 5-6.  In 2004, Alfonso's Inc. entered into a lease/purchase agreement for the Alfonso's Property and paid Perez approximately $4,000.00 per month.  *PSOF*, ¶ 6.

In 2006, Perez filed bankruptcy.  On March 21, 2007, the bankruptcy court approved the sale of the Alfonso's Property to Alfonso's Inc. and, as part of sale, required that Hilda Hernandez personally guarantee the payment on the loan.  *PSOF*

¶¶ 15-16.   In a somewhat discombobulated order, the following events then transpired in relation to the transfer of Alfonso's Property:

On April 30, 2007, a Warranty Deed was executed whereby Perez conveyed the Alfonso's Property to Alfonso's Inc.

On May 1, 2007, a resolution was prepared for Alfonso's Inc. indicating that the Alfonso's Property would be purchased for $400,000.00 from the bankruptcy estate and title held by Hilda Hernandez and Elvia Callahan as Joint Tenants.  The purchase was to be funded with a loan from Applewood Funding in the amount of $325,000.00, and by a seller carryback by Perez in the amount of $150,675.00[1]

On May 1, 2007, a Joint Tenancy Deed was executed conveying the Alfonso's Property from Alfonso's Inc. to Hilda Hernandez and Elvia Callahan.  The transfer was exempt from completion of an Affidavit of Property Value because it was listed as "[a] transfer between husband and wife, or parent and child with only nominal actual consideration for the transfer."

On May 9, 2007, an Affidavit of Property Value was recorded reflecting the sale of the Alfonso's Property for $400,000.00.  The seller is again identified as Perez and buyer is identified as Alfonso's Inc.

On October 15, 2007, Hernandez sent a letter to The Salvation Army, which owned property adjacent to the Alfonso's Property, offering to sell the Alfonso's Property for the amount reflected on an enclosed appraisal, $560,000.00.

On November 13, 2007, Hernandez and Callahan executed a Warranty Deed conveying the Alfonso's Property to The Salvation Army.

On November 28, 2007, an Estimated Settlement Statement reflected a sales price of $560,000.00.  Deducted from the proceeds were the

---

[1] The total of the two loan amounts is $475,675.00.  However, at settlement, Alfonso's Inc. paid a total of $533,005.75, which included various loan and closing fees, insurance and taxes.  *HUD Settlement Statement.*

balance due on the Applewood Funding[2] note and a payment to the IRS of approximately $26,000.00.  The payment to the IRS was for taxes due on a tax identification number assigned to Hilda Hernandez and not for the employment taxes owed by Alfonso's Inc.  The net proceeds, in excess of $175,000.00, were paid to Hernandez and Callahan.

On December 7, 2007, an Affidavit of Property Value was recorded reflecting the November sale of the Alfonso's Property from Hilda Hernandez and Elvia Callahan to The Salvation Army for $560,000.00 in cash.

*PSOF*, ¶¶ 18-26.

After the sale to The Salvation Army, Rogelio did not know where the net proceeds went. *Deposition of Rogelio Hernandez*, 79:1-24.  However, he was aware of the employment taxes due and surely told his mother about them.  His testimony indicates that he believed Alfonso's Inc. would benefit from the sale to The Salvation Army. *Deposition of Rogelio Hernandez*, 33:6-7.  Rogelio did not recall how title was to be held after the purchase from Perez, but at the time of the sale to The Salvation Army, his belief was that:

the whole thing was to sell that whole thing, and pay off whatever taxes were owed, whoever was owed.  That also should have been in the HUD.  Everything should have been squared away, and it would have been a book closed.  That's where my mind was at with this.

*Id*. at 39:11-16.

_____

[2] The Estimated Settlement Statement appears to identify the Applewood Funding note by the names of the individual lenders, Forrest Purdy and Janice Purdy. *See* Estimated Settlement Statement dated November 28, 2007.

6

1    Testimony from Hilda Hernandez and Elvia Callahan, along with a review of

2    the Estimated Settlement Statement associated with the sale of the Alfonso's

3    Property to The Salvation Army, clears the air somewhat as to where the proceeds of

4    the sale went.  Of the approximately $200,000.00 in net proceeds from the sale,

5    approximately $25,583.72 was paid out of escrow directly to the IRS for personal

6    taxes owed by Defendant Hernandez.  *See* Accrual Computation for Tax

7    Identification Number xxx-xx-1238, dated November 27, 2007; Estimated Settlement

8    Statement, dated November 28, 2007.   From the remaining proceeds of

9    approximately $175,846.40, Callahan received between $40,000.00 and $50,000.00

10   to repay what she had paid on behalf of Alfonso's Inc.  She testified that the amount

11   she was paid was to reimburse her for the monthly payments she made on the

12   Applewood Funding note in an amount of approximately $3,792.00.[3]  Although not

13   all of the bank records are available, those that are indicate that Callahan did make

14   the payments from the time of the purchase of the Alfonso's property from Perez in

15   May 2007 through the time of the sale of the Alfonso's Property to The Salvation

16   Army in November or December 2007.  *Deposition of Elvia Callahan*, 25:2-27:8.

17   After the payments were made to the IRS and Defendant Callahan, Defendant

18   Hernandez remained in control of the remaining $135,000.00 to $145,000.00 that

19   was paid at closing.

20

21   [3] Although Elvia Callahan testified that she made the payments on the Applewood
     loan, Rogelio testified that he and Callahan were making the payments. *Deposition*

22   *of Rogelio Hernandez*, 53:6-10.

7

1    **DISCUSSION**

2        The United States contends that Defendants Hernandez and Callahan owe the

3    IRS $47,059.00 for employment taxes that were not paid by Alfonso's Inc. from

4    2003 through 2007.  The government's theory is that the transfer of the Alfonso's

5    Property from Alfonso's Inc. to Hernandez and Callahan amounted to actual or

6    constructive fraud under Arizona law and deprived the IRS of the taxes due.

7        The standards for evaluating the government's claim are found in the Arizona

8    Fraudulent Transfer Act ("AFTA"), A.R.S. §§ 44-1001-1010.  A successful claimant

9    under AFTA must establish its (1) creditor status, (2) a property transfer, and (3)

10   actual or constructive fraud on the part of the transferor.

11       **1.    Actual Fraud**

12           **a.    Creditor Status**

13       The United States becomes a creditor for tax liabilities as of the close of the

14   respective tax years at issue.  *Edelson v. Comm'r of the I.R.S.*, 829 F.2d 828, 833-34

15   (9th Cir. 1987).  It is undisputed here that at least Rogelio Hernandez was aware of

16   the employment tax liabilities owed by Alfonso's Inc. even though they were

17   assessed against an entity identified as Alfonsa's.  Alfonso's had filed its taxes under

18   the EIN assigned to Alfonsa's (the 8725 number) and Rogelio Hernandez had gone to

19   the IRS to discuss the tax situation.[4]

20

21   _____

22   [4] It appears likely that the Alfonso's Inc. tax liabilities were not discovered by the
     escrow officer before the sale to The Salvation Army either because the Alfonso's

1

### b. Property Transfer

2    Under the AFTA, the term transfer includes: "every mode, direct or indirect,

3    absolute or conditional, voluntary or involuntary, or disposing of or parting with an

4    asset or an interest in an asset and includes payment of money, release, lease and

5    creation of a lien or other encumbrance."   A.R.S. § 44-1001(9).   Here, the record

6    establishes that on April 30, 2007, pursuant to an order by the bankruptcy court,

7    Alfonso Perez transferred the Alfonso's Property to Alfonso's Inc. by Warranty

8    Deed.   The next day, on May 1, 2012, Alfonso's Inc., functioning through its

9    president Rogelio Hernandez, executed a Corporate Resolution stating that the

10    subject property was to be held in the names of Hernandez and Callahan.   That same

11    day, Rogelio Hernandez executed a Joint Tenancy Deed conveying the Alfonso's

12    Property to Hernandez and Callahan.   These actions constituted a "transfer" within

13    the meaning of AFTA.   *Kaufmann v. M & S Unlimited, LLC*, 211 Ariz. 314, 318

14    (App. 2005).

15

### c. Actual Fraud

16    The final and determinative issue is whether the transfer defrauded the IRS by

17    preventing it from collecting on the Alfonsa's tax lien.   Under the AFTA, fraud can

18    be actual or constructive.   Actual fraud exists where the debtor made the transfer

19

20

---

21    Property had been transferred to Hernandez and Callahan or, more likely, because the tax lien was issued under the Alfonsa's name rather than Alfonso's.

22

1  "with actual intent to hinder, delay, or defraud any creditor of the debtor."  A.R.S. §

2  44-1004(A)(1).

3        To evaluate fraudulent intent, A.R.S. § 44-1004(B) lists eleven "badges of

4  fraud" which the court considers in evaluating whether the debtor had an actual intent

5  to hinder, delay or defraud the creditor.  "Badges of fraud" are "'facts which throw

6  suspicion on a transaction, and which call for an explanation.'"  Although they "'do

7  not of themselves or per se constitute fraud, . . . they are facts having a tenancy [sic]

8  to show the existence of fraud, . . . [and] their value as evidence is relative and not

9  absolute.'"  Further, "'[w]hen . . . several are found in the same transaction, strong,

10  clear evidence will be required to repel the conclusion of fraudulent intent.'"

11  *Torosian v. Paulos*, 82 Ariz. 304, 312, 313 P.2d 382, 390 (1957) (quoting *Humbird v.*

12  *Arnet*, 99 Mont. 499, 44 P.2d 756, 761 (1935)).

13        The eleven badges of fraud are:

14      1. The transfer or obligation was to an insider.

15      2. The debtor retained possession or control of the property transferred
    after the transfer.

16

17      3. The transfer or obligation was concealed.

    4. Before the transfer was made or obligation was incurred, the debtor

18      had been sued or threatened with suit.

19      5. The transfer was of substantially all of the debtor's assets.

20      6. The debtor absconded.

21      7. The debtor removed or concealed assets.

22

8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

10. The transfer occurred shortly before or shortly after a substantial debt was incurred.

11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

A.R.S. § 44-1004(B).   Here, the government contends that the transfers of the Alfonso's Property bear at least six of these eleven badges of fraud.

### i.     Transfer to an insider

The first badge, the transfer to an insider, is clearly present as to Hilda Hernandez.  It is not disputed that Hilda Hernandez was an officer of Alfonso's Inc. and the mother of Rogelio Hernandez, who was the president and operated the business.

This badge is less clearly present in relation to Elvia Callahan.  Callahan is Hilda Hernandez's niece and Rogelio Hernandez's cousin. However, she was not involved in the creation or operation of Alfonso's Inc.  The evidence suggests that she became involved in the transfer of the Alfonso's Property only because she was needed to co-sign to obtain the loan from Applewood Funding.  Moreover, the proceeds she was paid after the sale of the Alfonso's Property to The Salvation Army were purportedly repayment for money she had contributed to operating the restaurant and payments she made on the Applewood Funding note.

11

1

2

### ii.     The debtor retained possession or control of the property

3

4       The next indicator of fraud is whether the debtor retained possession or

5   control of the property after the transfer.  The evidence indicates that Alfonso's Inc.

6   continued to operate the restaurant until just before the sale of the Alfonso's Property

7   to The Salvation Army.   Rogelio Hernandez testified that the restaurant was

8   operating and that bills were incurred.  Although that was only for a few months, the

9   fact is not disputed and this badge is satisfied.

### iii.     The transfer or obligation was concealed

10

11      By transferring the Alfonso's Property to Hernandez and Callahan for nominal

12  consideration, rather than holding the property in the name of Alfonso's Inc., the

13  sellers were able to conceal the fact that Alfonso's Inc. was the owner of the asset.

14  As such, the escrow company did not discover the Alfonso's Inc. tax liens and the

15  taxes thus went unpaid.  By structuring the transfer of the Alfonso's Property as they

16  did, the transfer was concealed from the IRS.

### iv.     The debtor was insolvent after the transfer was made

17

18      At the time of the transfer of the Alfonso's Property, there is no dispute that

19  Alfonso's Inc. was in dire straits.   In addition to the employment taxes, other

20  creditors, such as utilities and vendors, were seeking payment for past due accounts.

21  *Deposition of Rogelio Hernandez*, 56:10-61:16 ("No, ma'am, the corporation never

22

12

1 had -- never was current on all their bills.").  Alfonso's Inc. was insolvent throughout

2 the time period encompassing the transfers of the Alfonso's Property.

### v.    The transfer was of substantially all of the debtor's assets

When Alfonso's Inc. acquired the Alfonso's Property from the Perez

bankruptcy estate, it took title to not only the property and building, but to all the

fixtures and equipment in the building.  *PSOF*, ¶ 20.  With the exception of the

corporation's bank accounts, which contained very little, these assets constituted

substantially all of the corporation's assets.

### vi.   The consideration received was not reasonably equivalent

In determining whether a debtor received a reasonably equivalent value for

fraudulent conveyance purposes, the court evaluates whether what the debtor

received was in the range of a reasonable measure of the value of what the debtor

transferred.  *In re Viscount Air Services, Inc.*, 232 B.R. 416 (D. Ariz. 1998).  Here,

the government points out that Hernandez and Callahan received $560,000.00 from

The Salvation Army for the Alfonso's Property only months after it was purchased

by Alfonso's Inc. for $400,000.00 and then transferred to them subject only to the

loan from Applewood Funding.  Given the $160,000.00, or 40%, increase in value in

those few months, no reasonable fact-finder could conclude that Alfonso's Inc.

received adequate consideration for the transfer of the property to Hernandez and

Callahan.

13

1    This conclusion is further bolstered by the fact that Alfonso's Inc. received no

2    proceeds from the sale to Hernandez and Callahan and none of the net proceeds from

3    the eventual sale to The Salvation Army were used to pay Alfonso's Inc.'s debts,

4    including the taxes in question here.

5                                    **vii.    Conclusion**

6    As discussed above, the transaction, especially as it related to Hilda

7    Hernandez, satisfied a number of the actual badges of fraud.  After the transaction,

8    Alfonso's Inc. remained in control of the Alfonso's Property for some time, the

9    transaction between Alfonso's Inc. and Hernandez and Callahan was effectively

10   concealed from the IRS, Alfonso's Inc. was insolvent at the time, with its only

11   significant asset being the Alfonso's Property, and the consideration paid by

12   Hernandez and Callahan was not reasonably equivalent to the value of the property

13   as evidenced by its sale for $560,000.00 shortly thereafter.

14   The only troubling element of fraud is whether the Alfonso's Property was

15   transferred to an insider.  Of course this trouble is not related to Defendant

16   Hernandez, who was clearly an insider as an officer of Alfonso's Inc. and as the

17   mother of Rogelio Hernandez.  It is the facts surrounding Callahan's involvement

18   that distinguish her situation from that of Hernandez.  It is not disputed that she

19   became involved only to assist Alfonso's Inc. obtain the financing necessary to

20   purchase the Alfonso's Property from the Perez bankruptcy estate.  It is also

21   undisputed that she paid some or all of the payments on the Applewood Funding

22   note.  For these reasons, she could reasonably be considered a creditor.  Couple that

1    with the question of whether she was an insider as that term is used in the AFTA, the

2    Court cannot conclude as to her that there are no genuine issues of material fact as to

3    her liability under the AFTA.

4        **2.      Constructive Fraud**

5        The government contends that, even if the Court finds that the badges of

6    actual fraud are not sufficient, as it has in relation to defendant Callahan, the

7    elements of constructive fraud are present.   The AFTA provides that transfers are

8    constructively fraudulent as to present creditors if:

9        the debtor made the transfer or incurred the obligation without
         receiving a reasonably equivalent value in exchange for the transfer or
10       obligation and the debtor was insolvent at that time or the debtor
         became insolvent as a result of the transfer or obligation.

11
     A.R.S. § 44-1005.   The discussion above establishes the transaction between
12
     Alfonso's Inc. and Hernandez and Callahan was a violation of section 1005.   As a
13
     threshold matter, the IRS has established that it was a creditor of Alfonso's Inc. at the
14
     time of the transfer.   Additionally, Alfonso's Inc. did not receive a reasonably
15
     equivalent value for the Alfonso's Property and it was admittedly insolvent at the
16
     time of the transaction.   Thus, the entire transaction was constructively fraudulent as
17
     to the IRS.
18
         **3.      Remedy**
19
         The AFTA provides several potential remedies for a debtor which establishes
20
     a fraudulent transfer.   These remedies include a judgment, garnishment against the
21
     fraudulent transferee, avoidance of the transfer, and "any other relief the
22
                                        15

1   circumstances may require." A.R.S. § 44-1007(A) & (B). In its motion, the United

2   States requests judgment be entered against Defendants Hernandez and Callahan in

3   the amount of the taxes now due. *Motion for Summary Judgment*, p. 15. The Court

4   agrees and recommends that judgment should be entered against Defendant

5   Hernandez under A.R.S. § 44-1007(A)(4)(c).

6           As for Defendant Callahan, questions remain. First, as to actual fraud,

7   questions remain about her insider status and whether she was acting as a creditor.

8   Second, under A.R.S. § 44-1008, Defendant Callahan may have defenses to the

9   allegations of constructive fraud. As is relevant here, that section of the AFTA

10  provides that "a good faith transferee or obligee is entitled, to the extent of the value

11  given the debtor for the transfer or obligation, to . . . [a] reduction in the amount of

12  the liability on the judgment." A.R.S. § 44-1008(D)(3). As to Defendant Callahan,

13  the evidence is not such that no reasonable fact-finder could conclude she acted in

14  good faith and/or gave value to the debtor. While the evidence is conclusive that

15  Alfonso's Inc., and its officers Rogelio Hernandez and Defendant Hilda Hernandez,

16  were aware of the tax debt, Callahan's knowledge of the debt has not been

17  established. Moreover, it is not disputed that Callahan made payments on the

18  Applewood Funding note and may be entitled to a credit for those payments which

19  could amount to a reduction of the judgment against her.

20  **IV.    RECOMMENDATION**

21          For the foregoing reasons, the Magistrate Judge **recommends** the District

22  Court, after its independent review, **grant in part** and **deny in part** the United

1   States' Motion for Summary Judgment (Doc. 28), and enter judgment against

2   Defendant Hilda Hernandez in the amount of $47,059.00, plus any statutory

3   additional, interest, and penalties, accruing from August 31, 2012.

4        Pursuant to Federal Rule of Civil Procedure 72(b)(2), any party may serve and

5   file written objections within 14 days of being served with a copy of this Report and

6   Recommendation.  If objections are not timely filed, they may be deemed waived.

7   The parties are advised that any objections filed are to be identified with the

8   following case number:  **CV-11-0250-TUC-DCB.**

9        **Dated this 17th day of January, 2013.**

Jacqueline M. Rateau
United States Magistrate Judge